# UNITED STATES DISTRICT COURT
for the
Southern District of West Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 2:18-mj-00038
Target Telephone more fully described in Attachment )
A (incorporated by reference) )
)

**FILED**
MAR 2 8 2018
RORY L. PERRY II, CLERK
U.S. District Court
Southern District of West Virginia

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the _____Southern_____ District of _____West Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846; 841(a)(1) | conspiracy to distribute controlled substances; unlawful distribution of controlled substances |

The application is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Charles Irwin, SA Drug Enforcement Administration
Printed name and title

Sworn to before me and signed in my presence.

Date: March 27, 2018

_____
Judge's signature

City and state: Charleston, West Virginia

Dwane L. Tinsely, United States Magistrate Judge
Printed name and title

**ATTACHMENT A**

The property to be searched consists of a cellular telephone more particularly described as follows:

1. **Target Telephone**: is a white iPhone with no external markings or identifiers. The Target Telephone was seized from Travis THOMAS' person at the time of his arrest, on or about January 25, 2018.

The cellular telephone is currently in the possession of the West Virginia State Police in Ona, West Virginia.

This warrant authorizes the forensic examination of the cellular telephones for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

All records on the **Target Telephone**, more fully described in Attachment A, that relate to violations of Title 21, United States Code, Sections 846 and 841(a)(1), including:

1. Sent and received text messages and other electronic messages stored on the cellular telephones;

2. Call logs, address books, contact lists, and calendars or schedules stored on the cellular telephones;

3. Photographs or other images, and voice memos or other recorded audio files stored on the cellular telephones;

5. Messaging applications (such as Facebook, Snapchat, and Whatsapp) where the messages are stored locally, on the **Target Telephone**. When searching for such messages, investigators will ensure the **Target Telephone** is on airplane mode prior to opening any applications. This will ensure that only messages stored on the **Target Telephone** will be accessed, and;

4. Evidence of user attribution showing who used or owned the cellular telephones at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

# **A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA

I, Charles E. Irwin, being first duly sworn on oath, depose and say:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.   I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  Specifically, I am a Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the Charleston, WV District Office.  In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, et seq.).  I have been employed as a Special Agent with the DEA since July 2014.  Prior to becoming a Special Agent, I served with the Durham Police Department as a police officer and investigator.  In my experience as a law enforcement officer, I have participated in numerous narcotics investigations, during the course of which I have participated in physical surveillance, undercover operations, and executions of search warrants.

2.   I have completed the DEA Basic Agent Training Course as well as other training courses related to gangs and narcotics trafficking.  I have participated in narcotics investigations at both the local and federal level, and I have participated in numerous federal search warrants.  As a result, I have become

1

familiar with methods of operation of drug traffickers and organizations. As a Special Agent with the DEA, I have the responsibility of working with other federal and state law enforcement officers in investigations of violations of federal and state controlled substance laws, including the investigation of cocaine, methylenedioxymethamphetamine (MDMA), methamphetamine, heroin, marijuana and other dangerous drug organizations.

3. I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking. I have discussed and learned from other law enforcement investigators in regards to these matters as well.

4. Based on my training, experience and conversations with other experienced narcotics investigators, I have gained experience in the techniques and methods used by drug traffickers to distribute controlled substances, their use of cellular phones and other electronic communication devices to facilitate their trafficking activity, and the methods used to conceal and launder the proceeds of said activity.

5. Through my involvement as co-case agent in a federal Title III investigation, I have gained experience in that

investigation involving the interception of wire communications. I have been directly involved in the review and deciphering of intercepted coded conversations between narcotics traffickers that were later corroborated by surveillance. Throughout my law enforcement career, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local narcotics officers about drug traffickers and their use of cell phones to facilitate drug trafficking by, for example, using code during their conversations. I have also received extensive instruction and practical training on intercepting communications and conducting coordinated surveillance while at the DEA Academy.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I have not included every fact concerning this investigation. This affidavit is intended to show merely that there is a sufficient factual basis for a fair determination of probable cause to support the Application.

## II. PURPOSE OF THIS AFFIDAVIT

7. This affidavit is submitted in support of an Application for a Search Warrant for the following **Target Telephone**:

**Target Telephone** is a white iPhone with no external markings or identifiers. The Target Telephone was seized from TRAVIS THOMAS' person at the time of his arrest, on or about January 25, 2018.

8. The applied-for warrant would authorize the forensic examination of the cellular telephones for the purpose of identifying electronically stored data more particularly described in Attachment B.

### III. THE INVESTIGATION

**A. Summary**

9. This investigation is being conducted by DEA Charleston, West Virginia State Police ("WVSP"), the Metropolitan Drug Enforcement Network Team ("MDENT"), and the Kanawha County Sheriff's Office ("KCSO"). This investigation began when multiple confidential sources and a source of information indicated that Jackie HARPER (hereinafter, "HARPER") was operating a large scale drug trafficking organization ("DTO") along with his girlfriend, Dominque ELY (hereinafter, "ELY"), and his childhood friend Travis THOMAS (hereinafter, "THOMAS"). Through multiple debriefs, investigators learned that HARPER utilized many re-distributors, one of whom was identified as Melody LEGG ("hereinafter, "LEGG"). Our investigation revealed that LEGG relied on her boyfriend Joshua NAYLOR (hereinafter, "NAYLOR") to assist in her drug trafficking activities. During many of our controlled purchases of methamphetamine from LEGG, NAYLOR accompanied LEGG to the meeting and NAYLOR sometimes conducted the hand-to-hand transaction on LEGG's behalf. LEGG has also involved some of her family members in HARPER's DTO, to include her son Timothy BOGGS (hereinafter,

"BOGGS"), and her brother Michael GINTHER (hereinafter, "GINTHER"). During our investigation, investigators have conducted controlled purchases of methamphetamine from LEGG and NAYLOR, BOGGS, and GINTHER.

10. During one particular controlled purchase from LEGG, discussed in this affidavit, LEGG was out of methamphetamine and had to call her supplier. Investigators were conducting surveillance and observed THOMAS drive to LEGG's residence, where we believe he delivered methamphetamine to LEGG, which was then sold to a confidential source. As a result of this investigation, LEGG, THOMAS, BOGGS, NAYLOR, and GINTHER were indicted and have since been arrested. During THOMAS' arrest, investigators seized the above-described **Target Telephone** from his person.

**B. August 31, 2017: Controlled Purchase of Methamphetamine from LEGG and THOMAS**

11. More specifically, on August 31, 2017, investigators met with CS2[1] in order to arrange a controlled purchase of one ounce of methamphetamine from LEGG. At approximately 2:30 p.m., investigators met with CS2 at a pre-arranged meeting location in Charleston, West Virginia. Investigators searched CS2 and CS2's vehicle for drugs, large sums of money, and weapons, with negative

---

[1] CS2 was signed up by Kanawha County Sheriff's Office in 2017. CS2 is working for judicial consideration on pending drug trafficking charges. CS2 has one prior arrest for Domestic Battery. CS2 has provided information that has been corroborated by investigators and thus far has proven to be a reliable and credible confidential source.

5

results. CS2 identified LEGG's new phone number as (304) 533-0738. At approximately 2:33 p.m., Investigators directed CS2 to place a recorded call to LEGG, (304) 533-0738. Investigators watched as CS2 dialed LEGG, (304) 533-0738. Furthermore, the call was made in the presence of investigators with the call on speaker phone. Investigators heard CS2 tell LEGG that he needed "one" and asked for the price. LEGG told CS2 that it would be $850 and told CS2 to come to her residence, which CS2 understood to mean 105 Dooley Lane, Charleston, West Virginia.

12. Based on my training and experience, I believe that CS2 asked LEGG for "one", which CS2 used as code for one ounce of methamphetamine. LEGG told CS2 that the cost would be $850, which based on my training and experience I know is consistent with the price of one ounce of methamphetamine in the Charleston, West Virginia, area.

13. Investigators equipped CS2 with a concealed audio and video recording device as well as a concealed audio live transmitting device[2]. Investigators provided CS2 with $850 and instructed CS2 to drive to 105 Dooley Lane and meet with LEGG.

14. At approximately 2:38 p.m., investigators followed CS2 from the pre-arranged meeting location and watched as CS2 drove directly to 105 Dooley Lane, Charleston, West Virginia.

---

[2] The meeting between CS2 and LEGG was recorded, and investigators reviewed the recording and corroborated the information provided by CS2.

6

Investigators observed CS2 walk into the residence at approximately 2:41 p.m.

15. At approximately 2:44 p.m., investigators were monitoring the audio transmitter and heard LEGG make a phone call. During the phone call, investigators heard LEGG say, "I got 850 for you." Investigators understood this to mean that someone would be brining LEGG the methamphetamine that CS2 requested to purchase.

16. At approximately 2:59 p.m., investigators monitoring the audio transmitter heard LEGG say, "Travis is coming here." Based on our investigation to date, summarized above, investigators suspected THOMAS would be bringing the methamphetamine to LEGG.

17. At approximately 3:13 p.m., investigators observed a 2002 Burgundy Jeep Cherokee[3] pull into a parking spot near the door for 105 Dooley Lane. Investigators observed the driver and only occupant of the Jeep Cherokee and recognized him to be THOMAS. Just as THOMAS parked, investigators observed LEGG walk out of 105 Dooley Lane holding money in her hand. LEGG got into the passenger seat and met briefly with THOMAS. Moments later, LEGG got out of the Jeep Cherokee and walked back into 105 Dooley Lane. Based on my training and experience, and our investigation to date, I believe that LEGG got into THOMAS' Jeep Cherokee in order to pay for the methamphetamine, which THOMAS brought at LEGG's request.

---

[3] This vehicle is bearing West Virginia license plate 5YP566 and is registered to Carlos Tackett at 2241 C&O Road, Boone, West Virginia.

7

This type of activity is typical in drug trafficking and is consistent with a hand to hand drug transaction.

18. Following the brief meeting with LEGG, THOMAS drove away from the apartment complex at a very high rate of speed. Investigators struggled to maintain surveillance of THOMAS but were able to maintain intermitted surveillance on THOMAS as he drove from 105 Dooley Lane, through downtown, towards the Capitol complex. Investigators eventually lost sight of THOMAS but proceeded directly to his suspected residence, 2310 E Washington Street, Charleston, West Virginia. Upon arrival, investigators observed the same Jeep Cherokee parked in the driveway unoccupied.

19. Meanwhile, some investigators remained at 105 Dooley Lane and at approximately 3:17 p.m., observed CS2 walk out of 105 Dooley Lane, get into his/her vehicle, and drive to a pre-arranged meeting location. There, CS2 handed investigators a plastic baggie containing a crystalline substance[4] and investigators again searched CS2 and CS2's vehicle for guns, drugs, and money, with negative results.

20. CS2 told investigators that he/she went to LEGG's residence, 105 Dooley Lane, which was occupied by LEGG, NAYLOR, Bruce BOGGS, LEGG's daughter, and LEGG's granddaughter. CS2 stated LEGG told him/her that she only had ten grams of methamphetamine

---

[4] This substance field tested positive for methamphetamine and had a gross weight of 53.8 grams.

8

and that it was already sold to another customer. CS2 stated that LEGG had to call THOMAS to get CS2's requested methamphetamine. CS2 stated that LEGG called THOMAS and ordered CS2's methamphetamine. CS2 stated that LEGG showed CS2 a silver handgun which was loaded and said the handgun belonged to LEGG's son, Bruce BOGGS. CS2 stated LEGG told CS2 that Bruce BOGGS would sell CS2 the handgun but Bruce BOGGS was high and passed out on the couch at that time, and thus unable to sell CS2 the handgun. CS2 stated LEGG heard THOMAS' sound system in his car when he pulled into the parking lot. CS2 stated at that time, LEGG took CS2's money and went outside to meet with THOMAS. CS2 stated moments later, LEGG returned with the ounce of methamphetamine and handed the methamphetamine to CS2. It should be noted that LEGG had to utilize a phone to contact THOMAS, thus indicating THOMAS' use of telephones to facilitate his drug trafficking activities.

**C.  Indictment and Arrest of THOMAS**

21. On January 23, 2018, a Federal Grand Jury in Huntington, West Virginia, indicted LEGG, NAYLOR, THOMAS, GINTHER, and BOGGS with Conspiracy to Distribute Methamphetamine. LEGG and THOMAS were also charged for Distribution of Methamphetamine for the August 31, 2018, controlled purchase discussed above.

22. On January 25, 2018, investigators with MDENT conducted surveillance near THOMAS' residence in Charleston, West Virginia. Upon observing THOMAS depart the residence, investigators arrested

THOMAS. Investigators conducted a search of his person at the time of his arrest and located the above listed **Target Telephone**.

23. Investigators secured the **Target Telephone** in an evidence locker, pending search. On March 23, 2018, the **Target Telephone** was transferred from MDENT evidence storage to DEA SA Gerrol. SA Gerrol transported the Target Telephone to the WVSP BCI Ona evidence storage room, where it is currently secured as evidence.

### IV. KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

24. Based on my training and experience, and that of those around me, I have learned the following common practices of drug traffickers:

> a) It is common for unlawful distributors of controlled substances to use their cellular telephones to send and receive text messages with other distributors and/or customers and maintain contact lists within their cellular telephones to facilitate their unlawful drug activities.
>
> b) It is common for unlawful distributors of controlled substances to use their cellular telephones for the following reasons, which include: 1) to arrange unlawful drug transactions; 2) to facilitate unlawful drug transactions; and 3) to communicate with other members of their unlawful drug organizations concerning matters related to their

unlawful drug activities. This is often done through the use of text messages which often remain stored on the device.

c) It is common for unlawful distributors of controlled substances to store persons' names and/or their corresponding phone numbers, and addresses or meeting locations of those who are involved in their drug trafficking operations in their cellular telephones' contact list.

d) It is common for unlawful distributors of controlled substances to maintain photographs and video on their cellular telephones that capture members of the unlawful drug organization; members of the unlawful drug organization in the presence of drug proceeds; and, members of the unlawful drug organization in the presence of firearms used to facilitate their drug trafficking activities. Many of the aforementioned photographs and video are considered "self-aggrandizing" portraits where unlawful distributors of controlled substances pose with United States currency to demonstrate the prosperity of their unlawful drug activities and pose with firearms to demonstrate the "fire-power" they possess to facilitate their unlawful drug activities.

e) Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is

11

reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

25. Based on all of the foregoing, I believe there is probable cause to believe that the sent and received text messages, and other electronic messages stored on the cellular telephones, the call logs, address books, contact lists, and calendars or schedules stored on the cellular telephones, photos or other images, and voice memos or other recorded audio files stored on the cellular telephones, will yield information that has been used to facilitate unlawful drug trafficking, and that there is probable cause to search the requested stored data. As previously noted, based on my belief, the aforementioned cellular telephones obtained from THOMAS may include all the aforementioned features.

26. Searching the cellular telephones for the evidence described above may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. Criminals can mislabel or hide directories and other electronic data to avoid detection or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the cellular telephones' memory not allocated to listed files, or opening every

file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described above.

### V. CONCLUSION

27. Based on investigation to date, summarized above, investigators believe there is probable cause to conclude that THOMAS was engaged in drug trafficking activity and had used his telephone to facilitate such activity. Investigators believe the **Target Telephone**, described in attachment A, may contain evidence related to THOMAS' drug trafficking relationship with LEGG, HARPER, and others, as described in Attachment B.

_____
Charles Irwin, Special Agent
Drug Enforcement Administration

SUBSCRIBED AND SWORN before me this 27th day of March, 2018.

_____
HONORABLE Dwayne L. Tinsley
United States Magistrate Judge

13